UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

FREDERICK J. HARRINGTON JR.,

        **Plaintiff,**

     -against-

ATLANTIC SOUNDING CO., INC.
WEEKS MARINE, INC., and THE MV CANDICE
her engines, equipment, and tackle, *in rem,*

        **Defendants.**

-----------------------------------------------------------------------x

<u>OPINION&ORDER</u>

06-CV-2900

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JAN 3 - 2013 ★

**BROOKLYN OFFICE**

**GERSHON, United States District Judge:**

     Plaintiff Frederick J. Harrington Jr. ("Harrington") brings this action against defendants

Atlantic Sounding Co., Inc. and Weeks Marine, Inc. ("Weeks"), pursuant to the Jones Act, 46

U.S.C. § 30104, for injuries sustained on April 10, 2005, allegedly as a result of defendants'

negligence while he was employed as a seaman aboard the defendant vessel MV CANDACE

("Candace").  Plaintiff also asserts claims for unseaworthiness under general maritime law.  *See*

28 U.S.C. § 1333.  The case was tried by the court, without a jury.

**Standard for Jones Act and Unseaworthiness Claims**

     Under the Federal Employers Liability Act ("FELA"), incorporated by reference into the

Jones Act, *see Wills v. Amerada Hess Corp.*, 379 F.3d 32, 47 n.7 (2d Cir. 2004),

> Every common carrier by railroad while engaging in commerce between any of
> the several States . . . shall be liable in damages to any person suffering injury . . .
> or . . . death . . . resulting in whole or in part from the negligence of any of the
> officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51.  In order to recover under the Jones Act, plaintiff must establish, by a

preponderance of the evidence, three elements: (1) that at the time of his injury, he was acting in

1

the course of his employment as a member the vessel's crew, *McCall v. Overseas Tankship Corp.*, 222 F.2d 441, 443 (2d Cir. 1955); (2) that the defendant was negligent, *Rosenquist v. Isthmian S.S. Co.*, 205 F.2d 486, 488-89 (2d Cir. 1953); and (3) that the negligent act caused plaintiff's injury, *Oliveras v. United States Lines, Co.*, 318 F.2d 890, 893 (2d Cir. 1963). Although Jones Act claims sound in negligence, the applicable burdens of proof differ. Regarding causation, under the Jones Act, an employer is liable to its employee if "employer negligence played *any part*, even the slightest, in producing the injury or death for which damages are sought." *See Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957) (emphasis in the original). In the Second Circuit, this relaxed standard also applies to proving a breach of the duty of care. *See Williams v. Long Island R.R.*, 196 F.3d 402 (2d Cir. 1999) ("While some circuits have limited the application of the 'in whole or in part' language to the element of causation and apply traditional standards to the duty of care owed, this Circuit has explicitly stated that it construes the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation." (citations omitted)). *But see, e.g., Gautreaux v. Scurlock Marine*, 107 F.3d 331, 335 (5th Cir. 1997) ("[T]he phrase 'in whole or in part," as set forth in the statute, . . . modifies only the causation prong of the inquiry. The phrase does not also modify the word 'negligence.'"). Nevertheless, "FELA is not a strict liability statute and the fact that an employee is injured is not proof of negligence." *Williams*, 196 F.3d at 406. Therefore, to prevail, plaintiff bears a reduced burden of proof with regard to negligence and causation.[1]

---

[1]  Defendants argue that *Williams* is no longer applicable, in light of *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630 (2011). In *CSX*, however, the Court held *only* that the causation test enunciated in *Rogers* rejected the narrow test for which defendants were arguing, and expressly dealt with "causation more generally," including the "directness" of the injury. *CSX*, 131 S. Ct. at 2637–39. Defendants argue that, because the Court in *CSX* stated that its precedents deal only with causation, *Williams* is necessarily not applicable to this case. This court disagrees. Just because the Supreme Court has discussed the relaxed standard only in the context of causation

With regard to plaintiff's unseaworthiness claim, a vessel is seaworthy when it "is reasonably fit to carry the cargo which she has undertaken to transport." *The Silvia*, 171 U.S. 462, 464 (1898). In other words, "[s]eaworthiness is defined as the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *GTS Indus. S.A. v. S/S "Havtjeld"*, 68 F.3d 1531, 1535 (2d Cir. 1995). Under the principles of seaworthiness, "an owner has an absolute duty to furnish a ship, crew, and appurtenances reasonably fit for their intended service." *Oxley v. New York*, 923 F.2d 22, 24 (2d Cir. 1991). A ship is considered unseaworthy when it is "insufficiently or defectively equipped." *Waldron v. Moore-McCormack Lines, Inc.*, 386 U.S. 724, 726 (1967). Liability for unseaworthiness does not depend on negligence or the owner's notice of the condition, *see Martinez v. United States*, 705 F.2d 658, 660 (2d Cir. 1983), and has therefore been characterized as "liability without fault" or strict liability. *Oxley*, 923 F.3d at 25; *Martinez*, 705 F.2d at 600. Nevertheless, the "standard is not perfection," and the ship need not use the "best possible ship, gear, or equipment." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960); *Morton v. Berman Enterp., Inc.*, 669 F.2d 89, 91 (2d Cir. 1982). All that is required is that the ship be reasonably fit for its designated purpose. Determining seaworthiness is a "broad, fact-specific determination that the district court must make." *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 69 (2d Cir. 1999). Traditional standards of causation apply. *Barlas v. United States*, 279 F. Supp. 2d 201, 208 (S.D.N.Y. 2003).

Under the Jones Act and the general maritime law that governs unseaworthiness claims,

---

does not, by implication, provide this court with authority to reject the clear precedent of the Second Circuit. In any event, even if the traditional burden of proof as to negligence were applied, I would find that plaintiff has met it.

the doctrine of comparative negligence applies.[2] *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408-09 (1953); *Socony-Vacuum Oil Co. v. Smith*, 305 U.S. 424, 429 (1939); *Ammar v. American Export Lines, Inc.*, 326 F.2d 955, 959-60 (2d Cir.), *cert. denied*, 379 U.S. 824 (1964). Thus, if a seaman's negligence has contributed to the cause of his injury, his recovery should be reduced proportionately. The seaman's negligence does not defeat his right to recover damages unless his negligence is the sole cause of his injury. The burden of showing that the seaman was negligent is on the defendant. Assumption of risk is not a defense to such suits. *Socony-Vacuum Oil*, 305 U.S. at 428.

### Findings of Fact and Conclusions of Law

A trial on liability and damages was held from July 16, 2012 to July 23, 2012. The following witnesses testified: (1) Thomas Sears, a maritime engineer and plaintiff's co-worker on the day of the incident in question; (2) Frederick Harrington, plaintiff, an Able Bodied Seaman; (3) Mitchell Stoller, plaintiff's maritime expert; (4) Andrew Verzilli, plaintiff's economic expert; (5) Michael Scheibe, Captain of the Candace; (6) Corey Posciask, First-Mate of the Candace; (7) Dr. Eric Hausknecht, defendants' neurologist; (8) Edmund Provder, defendants' vocational expert; (9) Dr. Leon Sultan, defendants' orthopedic specialist; Laura Bonanomi, defendants' economic expert; and (10) David Scruton, defendants' maritime expert. In addition, plaintiff's treating physician, Dr. Paul Houle, and defendants' safety director, Richard Voorhees, testified by deposition. Based on the preponderance of the credible evidence, as well as the parties' post-trial memoranda, the following are my findings of fact and

---

[2]       The relaxed standard of causation under the Jones Act also applies in the context of comparative negligence. *See Norfolk S. Railway Co. v. Sorrell*, 549 U.S. 158, 160 (2007) ("We conclude that the causation standard under FELA should be the same for both [direct and comparative] negligence . . . ."). In addition, by implication, based on *Williams*, the relaxed standard of negligence would also apply to comparative negligence.

conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### The Accident and Its Aftermath

At the time of the accident, plaintiff was fifty-two years old with only a high school education. He had, however, taken several maritime-related vocational courses. Over the course of his work history, plaintiff was a hull technician in the United States Navy and had held several additional civilian maritime positions, including jobs that would require line handling.[3] By all accounts, plaintiff was an experienced seaman. Prior to plaintiff's injury, he had received exemplary reviews from all of his superiors at Weeks. He was able to do any task assigned to him, with no physical limitations, and his co-workers all knew him to be an ideal shipmate. In addition, immediately prior to joining Weeks, plaintiff had obtained his Merchant Marine license, which required passing an extended series of tests as well as obtaining letters of recommendation from past employers.

On April 10, 2005, the crew of the Candace—which was comprised of plaintiff, Sears, Posciask, and Scheibe[4]—was tasked with moving underwater pipeline, submerged off the coast of Panama City, Florida. Prior to moving the pipeline, however, the Candace would first have to lift the anchor that was attached to either end of the pipeline, which was used to sink the pipeline when it was first put in position. This was achieved through a process called "anchor pulling" or "line pulling." In order to lift the anchor, a tugboat is required to position itself near a buoy, floating on the surface of the water, which is connected by a pennant wire to the anchor on the floor of the ocean. Plaintiff's maritime expert, Mitchell Stoller, who, among his extraordinary credentials, was twice appointed by the Secretary of Homeland Security to the National Towing

---

[3]     Line handling includes attaching ropes or cables connected to the boat with some other exterior object, such as a dock, pier, or barge.
[4]     At the time of the incident, however, Captain Scheibe was off duty and in his room, sleeping.

Safety Advisory Council, and whose testimony I credit, testified that a boat should be positioned so as "to minimize[] any chance of the vessel moving to cause these people to get jerked or lose their balance or [get] hurt." Tr. at 243.[5] Captain Stoller further testified that "the best position [for pulling anchors] would [be] having the bow into the sea instead of abeam, where the vessel was rolling."[6] Tr. at 243. If a boat is rolling or otherwise out of position, "the wire can get taut and jerk the crew members." *Id.* Once the boat is in position, one of the seamen approaches the edge of the boat and uses a boat hook to capture the pennant wire, which runs through the center of the buoy and forms an eyelet on top of the buoy through which the boathook can be positioned. Captain Stoller testified that, ideally, a boat should have a bulwark on which the seaman can brace himself while attempting to capture the pennant wire.[7] Tr. at 251–52. The seaman who captures the pennant wire will then pull the wire onto the boat, where the eyelet can be connected to the boat's trip hook, which is connected to the winch wire of the boat's towing winch, and which is held by a different seaman.[8] The boat's towing winch is then used to reel in the pennant wire, thereby lifting the pipeline anchor off the ocean's floor, at which point the pipeline can be moved. The pipeline anchor itself, however, is not lifted onto the boat or to the surface of the water, but is lifted only enough so that it will no longer drag on the ocean floor.

On the day of plaintiff's injury, the skies were clear and the wind was approximately 5-10 miles per hour. The seas were choppy, with 1-3 foot waves. Plaintiff and Sears were tasked

---

[5]     "Tr." refers to the trial transcript.

[6]     "Abeam to the sea" refers to the boat being positioned so that the waves are crashing into the port or starboard side of the boat, causing the boat to "roll" side to side, as opposed to the waves crashing into the bow (front) or stern (rear) of the boat, causing the boat to "pitch" forward and backward.

[7]     A bulwark is a wall-like structure that encloses the deck of a boat.

[8]     The pennant wire ran freely through the center of the buoy, so that, once it was connected to the boat's winch wire, the boat's towing winch could pull the pennant wire through the buoy without pulling the buoy itself onto the boat.

with pulling the anchors while First Mate Posciask maneuvered the Candace from above the deck in the boat's wheelhouse. From this position, Posciask could see out over the entire stern, where plaintiff and Sears were performing the anchor pulling task, and he could also see the Candace's position relative to the buoy. An intercom system allowed Posciask to talk to plaintiff and Sears while they were performing the task, and it was Posciask's job to keep the boat in position near the buoy and to warn the workers if the boat was moving out of position.

Prior to April 10, 2005, although he had witnessed others doing the job, Sears himself had no experience pulling anchors attached to floating pipeline.[9] Likewise, although Harrington had engaged in certain anchor pulling operations on other of defendants' vessels, before joining the Candace, which was on its maiden voyage, he had never done so on a vessel that had an open stern and a stainless steel deck. In addition, although Posciask had lengthy experience as a tugboat Captain or Mate, his experience maneuvering a tug for the purpose of pulling floating pipeline anchors was extremely limited, he having done so only immediately before the Candace set sail on its maiden voyage. Neither Sears, nor Harrington, nor Posciask received any instruction or training on how to perform the job safely.

As plaintiff and Sears began the process of retrieving and lifting the line anchor, plaintiff was tasked with using the boat hook to capture the pennant wire, while Sears held the winch cable and hook. Posciask had maneuvered the boat so that it was abeam to the sea, and therefore the boat was rolling back and forth. The rolling, combined with the wet stainless steel deck and the open stern, left plaintiff standing in an awkward position. After plaintiff captured the pennant wire and pulled the buoy toward the boat, he was crouched in a wide stance, in order to

---

[9]     There was testimony that Sears may have tied a rope to the belt of a seaman from another crew, who came aboard the Candace to assist with pulling anchors, in order to prevent that person from falling overboard. Sears himself, however, never made the connections prior to April 10.

7

maintain his footing while leaning forward to retrieve the pennant wire's eyelet. After retrieving the pennant wire, while attempting to connect it to the trip hook, the boat moved out of position, causing the pennant wire to go taut, which twisted plaintiff's back causing the injury in question. Nevertheless, because there was slack in the winch cable, plaintiff was able to make the connection with the trip hook and successfully complete the task.

Plaintiff did not immediately report the injury, as he was at the end of his watch and decided to retire for the day and see how his back felt in the morning. The next morning, plaintiff's injury was worse than the previous day, with pain radiating from his back down his right leg, so he reported the injury to Captain Scheibe. In the injury report that Captain Scheibe recorded, he stated that the cause of the accident was "Deck is wide open w/ open stern, nothing to hold on to or brace while hooking up anchor buoy. Will try & make connection on port stern, where there is a bulwark to lean on . . . ."

As plaintiff's injury caused increasing pain, Weeks sent him to the Bay Walk-In Clinic in Panama City, where plaintiff's back was x-rayed. The result of the x-rays was a diagnosis of "acute right lumbosacral muscle strain with right, either L5 or lumbosacral radiculopathy." The physician at Bay Walk-In Clinic found that plaintiff's injury did not represent "an exacerbation (temporary worsening) or aggravation of a pre-existing condition." Pl.'s Ex. 17, at 8. The doctor also found that there were no other "relevant co-morbidities that . . . need[ed] to be considered" in evaluating plaintiff's case.[10]  *Id.*  In other words, the doctor found that there was not "anything else that's causing the problem." Tr. at 620. On a scale of 1 to 10, plaintiff rated his pain a 9. After his examination, the doctor at Bay Walk-In Clinic recommended that plaintiff obtain an MRI, which he did, at Sun Coast Imaging, also in Panama City. The MRI revealed a

---

[10]     Defendants' medical expert defined "co-morbidity" as a "co-existing degenerative joint disease or alcoholism." Tr. at 620.

ruptured disc. It showed that there was "significant deformity" as a result of the herniation, and the doctor found the problem "quite compatible with a recent [injury]."[11]

Because plaintiff was physically unable to continue performing tasks as a seaman, he returned to his home in Massachusetts, where he went to his family physician, William Rhodes, who referred him to a neurosurgeon, Paul Houle, M.D. Dr. Houle diagnosed plaintiff with a herniated lumbar disc[12] and right foot drop[13] that was a result of a severely compressed nerve in plaintiff's lower back. This resulted in loss of strength and diminished sensation in his right leg, because of the brain's inability to send motor signals to the leg muscles via the nerves in the spine. The herniated disc was a direct result of plaintiff's injury aboard the Candace.

In light of the severity of plaintiff's symptoms, and the urgency of the situation, Dr. Houle recommended an immediate diskectomy.[14] On July 18, 2005, Dr. Houle performed the surgery. During the surgery, Dr. Houle drilled into plaintiff's spine, into what is called the "epidural space," where the nerves are located. Dr. Houle then made an incision in plaintiff's herniated disc in order to remove loose disc fragments that were putting pressure on plaintiff's spine. After the surgery, Dr. Houle recommended that plaintiff begin physical therapy.

After the surgery, although defendant's foot drop and lack of sensation had improved, there remained severe pain in his lower back. As a result of this, plaintiff had severely reduced range of motion in both flexion (forward motion) and extension (backward motion). This is a

---

[11]   The MRI revealed other mild pre-existing degenerations in plaintiff's spine.
[12]   A herniated disc occurs when soft disc fragments within the disc itself protrude through the tough exterior of the disc; this can cause, as it did here, spinal nerve compression.
[13]   A foot drop "implies a severe compression of a nerve" that "block[s] the nerve supply or the signals that go to the muscle . . . ." Houle Dep. Tr. at 16.
[14]   Dr. Houle testified that plaintiff's situation was urgent because "anyone with a neurologic deficit is in need of urgent surgery and the reason is that the longer there's pressure on the nerve, the less likely it is to recover." Houle Dep. Tr. at 25. Defendant's medical examiner, Dr. Thomas Antkowiak, who examined plaintiff contemporaneously with his injuries, concurred with Dr. Houle's assessment of both the disc herniation and the necessity for a disketomy.

9

somewhat common result of spinal surgery, as removal of spinal tissue can cause instability in the bones of the spine. This is because certain joints and ligaments, which normally provide stability to the spine, are removed during a diskectomy. Dr. Houle, therefore, recommended another MRI, which revealed a "residual or recurrent disc herniation," that was causing plaintiff's spinal canal to narrow. Because Dr. Houle did not want to immediately perform another spinal surgery, he recommended that plaintiff engage in physical therapy and that he get epidural steroid injections into the space around the nerves in his spine. Dr. Houle characterized this as conservative therapy.

In October 2006, plaintiff's back pain had worsened. Neither the physical therapy nor the steroid injections were alleviating plaintiff's condition.[15] By this point, plaintiff could not sit or stand for long periods of time, and he walked with a limp, assisted by a cane. He also had substantial pain when transitioning from sitting to standing. As a result of this, Dr. Houle ordered more testing, which revealed that there were air pockets in plaintiff's disc space, which is an indicator of disc instability. This indicated that plaintiff's condition was deteriorating, and therefore Dr. Houle recommended that plaintiff undergo a spinal fusion at his L4-5 disc.[16] After the fusion, plaintiff's condition stabilized, and the radiating pain improved.

In a follow up visit on May 7, 2009, plaintiff's condition had once again deteriorated. Dr. Houle found that plaintiff had weakness in his right foot at the ankle and that the severity of plaintiff's foot drop had increased. This finding was consistent with a February 2009

---

[15]    Defendants argue that plaintiff's alcoholism, discussed further below, hindered his physical therapy. Even assuming this to be true, defendants offer no evidence to suggest that inadequate physical therapy in any way affected plaintiff's need for a subsequent surgery or his permanent physical limitations. As Dr. Houle testified, plaintiff's alcoholism would have had no biological effect on his recovery.

[16]    A spinal fusion is a procedure whereby the entire spinal disc is removed, and a carbon-fiber cage is put in its place, and then fastened with screws to the bone above and below the disc space. The cage is then packed with a substance that will induce bone formation.

examination that plaintiff underwent at the Veterans' Affairs Hospital, where his gait was diagnosed as "antalgic," a diagnosis consistent with foot drop. During this time, plaintiff was receiving epidural steroid injections near his spine, to alleviate the pain. The pain relief from these injections, however, was temporary, so plaintiff underwent Radio Frequency Ablation therapy ("RFP"). RFP is a process whereby needles are placed into a patient's back, near the spine, as close as possible to the nerve endings that surround the spine. Radio frequencies are then used to heat the needles, thereby destroying the nerve endings in order to provide pain relief. Like steroid injections, however, the relief is temporary (albeit for longer than injections) because the nerve endings regenerate, and the process must be repeated.

Finally, Dr. Houle examined plaintiff for the last time on January 3, 2012. He found that plaintiff had "three out of five weakness in his right lower extremity," causing him to have a foot drop. At this point, plaintiff had reached "maximum improvement," with permanent restrictions in his activity including being unable to sit or stand for longer than 30 minutes at a time, being unable to lift, push, or pull anything greater than 20 pounds,[17] and being unable to bend at the waist without pain. In addition, plaintiff uses a cane to assist with walking. Plaintiff has been out of work since the accident.

### *Liability*

#### Jones Act

"The risk reasonably to be perceived defines the duty to be obeyed . . . ." *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 344 (N.Y. 1928); *see also Wilburn v. Maritrans GP*, 139 F.3d 350, 357 (3d Cir. 1998) ("[N]egligence requires the defendant to guard against those risks or dangers of which it knew, or by the exercise of due care, should have known."). Here, it was

---

[17]   Immediately after his accident, defendants' independent medical examiner found that plaintiff should refrain from lifting anything greater than five pounds.

well known that back injuries are common on tug operations, when working with anchor lines and while twisting at the waist, as plaintiff was at the time of the injury, and specifically when an anchor wire goes taut. Therefore, the question is, in light of these perceived risks, as well as plaintiff's relaxed burden of proof, whether plaintiff carried his burden of proving that defendants failed to exercise reasonable care in the operation of the Candace. I find that he did.

All of the men working on the Candace at the time of the injury—including plaintiff, Sears, and Posciask—had limited or no experience pulling line anchors through buoys from an open stern tug. Specifically, neither plaintiff nor Sears, prior to working on the Candace, had ever pulled line anchors on a tug with an open stern; indeed, Sears had never, in his 45 years of experience, worked on a tug with an open stern.[18] Nevertheless, Weeks provided no instruction or training to its crew as to how best to perform the task of anchor pulling or the risks associated with anchor pulling. This is despite the fact that defendants' safety director testified at his deposition that, "Every time an anchor is handled they are to do an abbreviated risk analysis of the activity. If . . . there were changes to risk that they would have seen at the time they would address them at that time . . . ." Voorhees Dep. Tr. at 35. The insufficiency of training is illustrated by the fact that, despite the persuasive testimony of plaintiff's maritime expert, as well as Captain Schiebe, that, when pulling anchors, a boat should not, unless it is unavoidable, be

---

[18]   At trial, defendants argued that the Candace was designed with an open stern because that design was well suited for pulling large anchors up onto the deck of the Candace. While this may be true, the task that plaintiff was performing did not involve pulling large anchors onto the deck of the Candace. Rather, plaintiff was tasked with pulling much smaller line anchors, which the Candace would drag behind it just off the ocean floor. If defendants wish to use the Candace for a task other than that for which it was built, they may do so; but they must ensure that the design of the boat, in combination with other factors, does not interfere with their duty of care toward their employees. *See Rodriguez v. Coastal Ship Corp.*, 210 F. Supp. 38, 43 (S.D.N.Y. 1962) (stating that there is "no authority for insulating the shipowner from liability when innovations in converting or modernizing a vessel, however timesaving and efficient they may prove to be, at the same time increase the dangers to men working thereon").

positioned abeam to the sea, Mate Posciask testified that a boat's position to the sea was not his primary concern when positioning the Candace, but rather, he was responsible for getting the boat as close to the buoy as possible.[19]

On the day in question, Posciask had in fact positioned the boat abeam to the sea, and therefore the boat was rolling, causing unsteady footing on the stern where plaintiff and Sears were pulling anchors. Although plaintiff was able to adequately maintain his footing, the combination of the rolling boat and the open stern required plaintiff to maintain an awkward position while holding the pennant wire with one hand and reaching back for the winch wire with the other.[20] When Posciask allowed the Candace to move out of position, the pennant wire went taut, causing plaintiff's injuries.

Given his vantage point, looking out over the stern from above, in the Candace's wheel house, only Mate Posciask had sufficient ability to view the boat's position, relative to the buoy, and ensure that plaintiff was in a position to perform the task safely. Indeed, Captain Stoller testified credibly that only through Posciask's negligence could the boat come out of position. Mate Posciask's duty was especially important in light of the Candace's open stern and the fact that Posciask had positioned the tug abeam to the sea. Mate Posciask failed to fulfill this duty. In short, defendants failed to satisfy their "duty . . . to provide [plaintiff] a reasonably safe workplace." *Wills*, 379 F.3d at 42 (citing *Oxley*, 923 F.2d at 25). Weighing all of these facts and

---

[19]     Indeed, Mate Posciask's testimony was evasive and bordered on flippant when he described how the Candace should be positioned, as well as the need for any safety training specific to the job the crew was performing on April 10. His testimony reflected that he took the safety and necessary knowledge of the Candace's crew for granted. For example, he did not know whether plaintiff had ever performed anchor pulling on an open stern deck prior to the accident.

[20]     Defendants, at least implicitly, acknowledge that a closed stern would have been safer. *See* Defs.' Mem. of Law at 5 ("The Candace is a safer platform [than an A-frame] to do the job since it is open only at the stern, rather than at three sides like the A-frame.").

circumstances, and in light of the totality of the credible evidence, I find that plaintiff proved by a preponderance of the evidence that defendants breached their duty of care to plaintiff through their negligent operation and handling of the tug Candace and that such negligence proximately caused plaintiff's injuries.[21]

Defendants have suggested that, if they are liable for plaintiff's injuries, his award should be reduced because he was contributorily negligent by not stopping the work and letting Mate Posciask know he felt the work conditions were unsafe. But plaintiff reasonably thought the job could be done safely and was entitled to assume that Mate Posciask would ensure that the boat would stay in position—a responsibility that was indisputably his. Had Posciask kept the boat in position, and not allowed the line to go taut, plaintiff would not have injured his back. Posciask failed to do so. Therefore, I reject defendants' argument regarding contributory negligence.

### Unseaworthiness

Although an isolated instance of operative negligence does not render a vessel unseaworthy, *see Calo v. Ocean Ships*, 57 F.3d 159, 161 (2d Cir. 1995), a crew's lack of adequate training for the task to be performed does. *See Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 697 (S.D.N.Y. 2008); *Cerro Sales Corp. v. Atl. Marine Enters.*, 403 F. Supp. 562, 567 (S.D.N.Y. 1975); *see also Marceaux v. Conoco, Inc.*, 124 F.3d 730, 734–735 (5th Cir. 1997). Here, it is clear that neither plaintiff, nor Sears, nor Posciask was adequately trained to pull line anchors from the Candace, the job they were tasked with performing on April 10.

---

[21]     As discussed above, plaintiff need meet only the reduced burden of proof that is enunciated in *Williams*. However, I would find for plaintiff even if traditional negligence standards applied.

Sears and Harrington had very limited experience pulling line anchors through floating buoys on a tug with an open stern.[22] Posciask had none.  They were working on a brand new vessel unlike any that defendants had previously launched and which was designed for a task different from that in which the three were engaged.  Indeed, the potential danger of pulling anchors through an open stern is illustrated by Captain Scheibe's accident report, which stated that an open stern provides "nothing to hold on to or brace while hooking up anchor buoy," and which suggested that, in order to do the job more safely, Captain Scheibe would "try & make connection on port stern, where there is a bulwark to lean on . . . ." Pl.'s Ex. 29.  Nevertheless, defendants provided no training, no assessment of the risks, and provided no instruction on how the task might be performed safely or how plaintiff might position himself while attempting to pull an anchor without a stern on which to brace himself.  Finally, and most importantly, defendants failed to train Mate Posciask on how best to position, and keep in position, the tug while plaintiff was pulling the anchors.  For instance, despite his Captain's testimony to the contrary, Posciask believed that there was no detriment to positioning the boat abeam to the sea. Moreover, the credible evidence established that, while the boat was rolling (because of its position relative to the seas), Posciask allowed the boat to move out of position (relative to the buoy), thereby causing plaintiff's injury, which likewise reflects the inadequate—in fact, nonexistent—training that defendants provided.

Plaintiff has therefore proved by a preponderance of the evidence that the Candace was unseaworthy while plaintiff was engaged in line-anchor pulling on April 10, 2005.

---

[22]     There was conflicting testimony as to the extent of plaintiff's experience pulling line-anchors on an open-stern tug prior to April 10, 2005.  However, I find that, even if Harrington had such experience, it was limited to previous work on the Candace, which was highly limited.

*Damages*

**Disability**

Plaintiff is unable to sit or stand for longer than 30 minutes at a time.  He is unable to lift, push, or pull anything greater than 20 pounds, and is unable to bend at the waist without pain. Despite these limitations, defendants argue that, although plaintiff is partially disabled, he retains the ability to work in a "sedentary or light duty capacity."  I agree.  The credible evidence established that plaintiff is substantially disabled.  But even his own treating physician testified that he retained the ability to perform sedentary work.  Therefore, I find that plaintiff has the potential to perform sedentary work.

Defendants also argue that, to the extent that plaintiff is disabled, his disability is caused, in part, by cerebellar ataxia, a degeneration of the cerebellum, and that any potential damage award should be reduced accordingly.  In support of this contention defendants point to plaintiff's undisputed lengthy history of alcoholism, which is the most common cause of cerebellar ataxia.   Defendants presented expert testimony that plaintiff has significant degeneration of his cerebellum and that this degeneration is causing symptoms such as a wide-based gait and peripheral neuropathy.[23]  In contrast, plaintiff's treating physician testified that he saw no indication of cerebellar ataxia, and one of defendant's experts found no peripheral neuropathy.

Even assuming plaintiff does in fact have some level of cerebellar ataxia,[24] and its associated symptoms, defendants proffered no credible evidence that this condition plays any

---

[23]      Peripheral neuropathy is a syndrome that affects the nerves in an individual's extremities, causing loss of feeling or a tingling sensation.
[24]      The evidence reflected that, at most, plaintiff's cerebellar ataxia varied in its severity.  In the years prior to this litigation, various doctors intermittently found little to no evidence of ataxia or peripheral neuropathy while others found substantial symptoms of these conditions.

causative role in the physical limitations that disable him from all but light or sedentary work. Plaintiff, however, presented persuasive credible evidence that his inability to perform all but such work is solely the result of his back injury.[25]   Plaintiff's treating physician, Dr. Houle, testified credibly that the April 10 injury and resultant surgeries are the sole cause of plaintiff's disability.   In addition, contemporary medical records from the Bay Walk-In Clinic stated that plaintiff had no "co-morbidities," *i.e.*, other medical conditions causing his symptoms.   In short, plaintiff proved by a preponderance of the evidence that the limitations on his ability to work are solely the result of the April 10 incident.

### Lost Wages

In assessing damages based on lost wages, the court should "subtract plaintiff's post-accident earning power from his normal earning power (both figures should be after-tax), and multiply the loss by the plaintiff's [work] life expectancy. The resulting figure should then be discounted to its present value.   [P]laintiff's post-accident earning power should reflect the plaintiff's duty to take reasonable steps to effect a cure for his injuries and to mitigate damages." *Williams v. United States*, 712 F. Supp. 1132, 1136 (S.D.N.Y. 1989) (citations and quotations omitted).   However, the "burden of showing that a plaintiff unreasonably failed to minimize damages rests with the wrongdoer." *Federal Insurance Co. v. Sabine Towing & Transportation Co.*, 783 F.2d 347, 350 (2d Cir. 1986).   The standard that governs a plaintiff's earning potential is "'whether she can by reasonable diligence find gainful employment, given the physical condition in which the accident left her.'" *Williams*, 712 F. Supp. at 1139 (quoting *O'Shea v. Riverway*

---

[25]      Defendants do not dispute that plaintiff's back injury and the need for two surgeries was caused by the April 10 incident.   They do, however, suggest that a separate, slight spinal degeneration, which is the normal result of aging, may contribute to plaintiff's condition.   To the extent that defendants' memorandum can be read to argue that this degeneration is contributing to plaintiff's disability, the credible evidence does not support this conclusion.

*Towing Co.*, 677 F.2d 1194, 1197 (7th Cir. 1982)).  In making this assessment, the court must "determine how much the plaintiff is capable of earning, given his physical condition, age, education, employment history, and rehabilitative potential, and discount that figure by the risk that appropriate work will be unavailable." *Id.* Here, plaintiff has not been gainfully employed since his accident.  The question, then, is whether defendants satisfied their burden of proving that plaintiff unreasonably failed to mitigate his damages.  I find that they did not.

Plaintiff unquestionably took all reasonable steps to effect a cure for his injuries.  With regard to work, defendants showed that plaintiff has at least the *potential* for performing sedentary, or "light" work.  They also submitted evidence from vocational expert Edmund Provder regarding a representative list of light work, how many jobs exist in plaintiff's geographic area, and the mean salary for those jobs.  What defendants failed to prove, however, is that plaintiff, given his physical condition, age, education, and employment history, could in fact obtain any of these jobs.

I note that Mr. Provder's testimony simply did not support defendants' contention that plaintiff failed to mitigate his damages.  Although physical condition is presumably taken into account in determining what jobs constitute light work, it is obvious that plaintiff would be unable to perform many of the jobs on Mr. Provder's list of representative light work.  For instance, Mr. Provder testified that plaintiff could perform the work of a security guard.  Based on his physical limitations, however, plaintiff clearly could not perform such work.  Likewise, Mr. Provder testified that plaintiff could be an Information and Records Clerk.  However, as discussed below, plaintiff has no computer skills (and, indeed, is unable to operate a computer), which such a position would undoubtedly require.  In short, Mr. Provder provided an entirely unrealistic list of jobs that plaintiff could purportedly perform.

18

In addition, Mr. Provder's list reflected only how many jobs exist for each category, not how many jobs are in fact available. Also, plaintiff has no experience in any of the jobs Mr. Provder listed. Finally, by the time plaintiff had concluded his surgeries and efforts at rehabilitation he was at least fifty-five years old. And, as Mr. Provder acknowledged, plaintiff has limited education; he spells and does arithmetic at a 4th and 7th grade level, respectively. Given the economic reality of competing for jobs against younger, more educated job applicants who may have experience in any given position, it is highly unlikely that plaintiff could actually obtain any of the jobs Mr. Provder detailed. Defendants, therefore, have not shown that plaintiff failed to mitigate his damages through obtaining alternate employment.

Plaintiff, therefore, is entitled to economic damages in the amount of his full earning capacity multiplied by his remaining years in the work force at the time of his accident. Regarding his earning capacity, defendants presented three different figures: a figure based on his entire work history; a figure based on Weeks's payroll records; and a figure based on plaintiff's tax returns. I find that none of these figures accurately measures plaintiffs' full ability to earn an income. With regard to his entire work history, defendants' figure significantly understates plaintiff's earning capacity. Prior to joining Weeks, plaintiff had a somewhat sporadic work history, earning much less than he earned working for Weeks. However, immediately prior to joining Weeks, plaintiff obtained his Merchant Marine license, a certification that increased greatly plaintiff's earning capacity. Moreover, during his time at Weeks plaintiff received exemplary reviews, and the evidence reflected that he had gotten his drinking under control. There is therefore no reason to believe that plaintiff would not have continued working for Weeks for the remainder of his work life.

19

With regard to plaintiff's tax returns, they understate plaintiff's earnings because they represent only his taxable income, not his gross income, which is reflected in Weeks's payroll records. However, Weeks's payroll records do not account for plaintiff's medical insurance benefits, which should be taken into account. Defendants' expert's analysis to the contrary was unsound. Therefore, I find that plaintiff's earning capacity, at the time of his accident, based on Weeks's payroll records in addition to social security and medical benefits, is $47,337. When reduced to account for taxes, the figure is $41,174; multiplied by 7.1 years, which represents the amount of time plaintiff was out of work from his accident to the date of the trial (which need not be discounted), the total is $292,335. In addition, at the time of trial, defendants' economic expert indicated plaintiff had 4.8 additional years in his work life expectancy; multiplying this figure by his earning capacity results in an additional $197,635 which, when discounted by 2% to reflect present value, equals $186,613. In total, therefore, I find that plaintiff is entitled to an award, based on lost wages, of $478,948.[26]

### Pain and Suffering

In determining plaintiff's pain and suffering award, the court must assess plaintiff's past and future pain and suffering, and must discount to present value any award of future pain and suffering, although such discounting need not apply the precision applicable to the discounting of future earnings. *See Oliveri v. Delta S.S. Lines, Inc.*, 849 F.2d 742, 751 (2d Cir. 1988) ("[A]ll that is required for awards of non-pecuniary future damages is that the time value of money be taken into account." (citations and quotations omitted)). In addition to pain and suffering, the court must consider loss of life's pleasures, although the court need not assign separate figures to

---

[26]     The numbers used here were agreed upon by defendants' economic expert, after using the parameters testified to by plaintiff's economic expert, Andrew Verzilli, whom I found credible and persuasive. These numbers include plaintiff's gross wages, his loss of Weeks's social security contribution, and his loss of medical insurance benefits.

these measures, but rather, may compute a single pain and suffering figure, as long as there is no double counting. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1326–27 (1990).

It is undisputed that plaintiff's injury, and the resultant surgeries and other treatments, resulted in a tremendous amount of pain and suffering. As discussed above, plaintiff required two painful surgeries, epidural steroid injections directly into his spine, and RFA to destroy nerve endings in his back. As plaintiff testified credibly, these surgeries and treatments resulted in extreme pain. Moreover, plaintiff lives with constant, substantial lower back pain that requires daily medication merely to render it manageable. Plaintiff's pain and suffering is therefore significant.

Plaintiff's loss of enjoyment is likewise significant. Plaintiff can no longer do any of the activities that he did prior to the injury, including fishing, maintenance of his home, walking on the beach, scuba diving, or riding a bike. In addition, because of his limitations regarding sitting and walking, plaintiff is substantially confined to his home and has gained a significant amount of weight. Plaintiff attempted to take computer classes, so that he would be able to work a computer, but was unable to take the class because he could not sit for the required period of time.

In light of the above, I find that plaintiff is entitled to an award for past pain and suffering in the amount of $500,000. I find that plaintiff is entitled to future pain and suffering, based on the agreed life expectancy of 21.3 years, of $700,000. *See Frazier v. Norfolk & W. Ry. Co.*, 996 F.2d 922 (1993); *Bachir v. Transoceanic Cable Ship Co.*, 2002 U.S. Dist. LEXIS 4340 (S.D.N.Y. Mar. 15, 2002). Although I find that plaintiff may have loss of enjoyment of life resulting from his alcoholism and possible cerebellar ataxia, these figures include only that pain and suffering and loss of enjoyment attributable to the physical impairments resulting from his

21

back injury.  In addition, as required by *Oliveri*, the award for future pain and suffering takes into account the time value of money.

The Clerk of Court is ordered to enter judgment for plaintiff in the amount of $1,728,948. In addition, under the law of unseaworthiness, plaintiff is entitled to pre-judgment interest on his past lost income.  The Clerk of Court is therefore directed to calculate an award of prejudgment interest on that aspect of his damages, to be compounded annually, at a rate of 2%, from April 10, 2005, through the date of judgment.  Two percent represents the average 52 week Treasury Bill rate for the applicable period, as referred to in 28 U.S.C. § 1961.  *See Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 91 Fed. Appx. 370, 377 (6th Cir. 2004) (upholding the district court's use of 28 U.S.C. § 1961 to calculate prejudgment interest on the plaintiff's unseaworthiness claim); *Luciano v. Olsten Corp.*, 912 F. Supp. 663, 676–77 (E.D.N.Y. 1996) (using 28 U.S.C. § 1961 to award prejudgment interest on plaintiff's back-pay award under Title VII of the Civil Rights Act of 1964), *aff'd* 110 F.3d 210 (2d Cir. 1997).

**SO ORDERED.**

s/NG

**NINA GERSHON**
**United States District Judge**

Dated:   January 3, 2013
         Brooklyn, New York